**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| INVITAE CORPORATION, *et al.*, | Case No. 24-11362 (MBK) |
| Debtors. | (Jointly Administered) |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | Hon. Robert Kirsch |
| Appellant, | Case Nos.  3:24-cv-08550 (RK) |
| | 3:24-cv-08555 (RK) |
| v. | |
| INVITAE CORPORATION, *et al.*, | |
| Appellees. | |

**RESPONSE BRIEF OF DEERFIELD PARTNERS, L.P.**

**SULLIVAN & CROMWELL LLP**
Justin J. DeCamp (admitted *pro hac vice*)
Ari B. Blaut (admitted *pro hac vice*)
Benjamin S. Beller (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone:     (212) 558-1656
Facsimile:     (212) 558-3588
Email:     decampj@sullcrom.com
     blauta@sullcrom.com
     bellerb@sullcrom.com

*Counsel to Deerfield Partners, L.P.*

**WOLLMUTH MAHER & DEUTSCH LLP**
James N. Lawlor
500 Fifth Avenue
New York, NY 10110
Telephone:     (212) 382-3300
Facsimile:     (973) 741-2398
Email:     jlawlor@wmd-law.com

*Counsel to Deerfield Partners, L.P.*

Dated:  November 15, 2024

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STATEMENT OF THE ISSUES PRESENTED ..................................................... 4

SUMMARY OF THE CASE ................................................................................. 5

    I.  The Company Begins Exploring Restructuring Transactions in 2022. ......... 5

    II.  Negotiation of and Entry into the March Exchange..................................... 8

    III. Market Reaction to the March Exchange and the August Exchange............10

    IV.   Deerfield's View of the Company's Prospects Evolves as Events Unfold................................................................................................11

    V.  The Chapter 11 Cases ...............................................................................12

SUMMARY OF ARGUMENT ..........................................................................145

STANDARD OF REVIEW ...............................................................................166

ARGUMENT....................................................................................................188

    I.  The Committee's Appeal Should Be Dismissed as Equitably Moot. .........188

        A.  The Plan Has Been Substantially Consummated................................189

        B.  Granting the Committee's Requested Relief Would Fatally Scramble the Plan. ..................................................................................20

    II.  The Bankruptcy Court Exercised Its Sound Discretion in Denying the Standing Motion. .....................................................................................24

        A.  The Committee Failed to Carry Its Burden to Show Both That the Proposed Claims Were Colorable and That the Debtors Have Unjustifiably Refused to Bring Them. ..................................................25

        B.  The Committee Failed to Establish That the Proposed Claims Were Colorable. .........................................................................................25

            1.  The Committee's Claim That the March Exchange Was a Constructive Fraudulent Transfer Was Not Colorable.......................26

ii

(a) The March Exchange Is Protected by the Section 546(e) Safe Harbor...........................................................26

    (1) The March Exchange Was a Qualifying Transaction and Deerfield Was a Qualifying Participant...................................26

    (2) The Committee Cannot Circumvent the Safe Harbor by Only Attacking the March Exchange Liens...........................289

(b) The Committee Failed to Establish the Elements of a Constructively Fraudulent Transfer Claim. ................................30

    (1) The Debtors Received Reasonably Equivalent Value in the March Exchange. ...........................................31

    (2) Invitae Was Not Insolvent When the March Exchange Was Executed. ...........................................35

2. The Committee's Claim That the March Exchange Was an Actual Fraudulent Transfer Was Not Colorable. ..............................37

3. The Committee's Claim That Deerfield Aided and Abetted Invitae Officers' and Directors' Alleged Breach of Fiduciary Duties Was Not Colorable. ...........................................389

C. The Bankruptcy Court Exercised Its Sound Discretion in Finding That the Committee Failed to Show That the Debtors' Refusal to Pursue the Proposed Claims Was Unjustifiable....................................41

1. The Bankruptcy Court Made Specific Findings with Respect to Its Cost-Benefit Analysis. ...................................42

2. The Committee Offers No Legitimate Argument That Calls the Debtors' Business Judgment Into Question.....................................48

III. The Bankruptcy Court Properly Exercised Its Discretion in Approving the Debtor Releases. ...........................................51

CONCLUSION ...........................................55

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
  330 B.R. 364 (Bankr. S.D.N.Y. 2005)................................................................45

*ALA, Inc.* v. *CCAIR, Inc.*,
  29 F.3d 855 (3d Cir. 1994)...................................................................................26

*In re Allied Nev. Gold Corp.*,
  725 F. App'x 144 (3d Cir. 2018).........................................................................20

*In re Am.'s Hobby Ctr., Inc.*,
  223 B.R. 275, 280 (Bankr. S.D.N.Y. 1998)........................................................50

*Anand* v. *Nat'l Republic Bank*,
  239 B.R. 511 (Bankr. N.D. Ill. 1999)..................................................................32

*Bd. of Trustees of Teamsters Loc. 863 Pension Fund* v. *Foodtown, Inc.*,
  296 F.3d 164 (3d Cir. 2002).................................................................................39

*In re Bernard L. Madoff Inv. Sec.*,
  773 F.3d 411 (2d Cir. 2014).................................................................................29

*Binks* v. *DSL.net, Inc.*,
  2010 WL 1713629 (Del. Ch. Apr. 29, 2010).......................................................39

*In re Boy Scouts of Am. & Delaware BSA, LLC*,
  650 B.R. 87 (D. Del. 2023)..................................................................................18

*Buttonwood Tree Value Partners, L.P.* v. *R.L. Polk & Co.*,
  2017 WL 3172722 (Del. Ch. July 24, 2017) .......................................................41

*In re Caesars Ent. Operating Co., Inc.*,
  561 B.R. 457 (Bankr. N.D. Ill. 2016)..................................................................48

*In re Coinbase Glob., Inc. Sec. Litig.*,
  2024 WL 4053009 (D.N.J. Sept. 5, 2024)...........................................................31

*In re Consol. Nevada Corp.*,
   2017 WL 6553394 (B.A.P. 9th Cir. Dec. 21, 2017), *aff'd*, 778 F.
   App'x 432 (9th Cir. 2019)..................................................................................17

*In re Cont'l Airlines*,
   91 F.3d 553 (3d Cir. 1996)...............................................................................18

*Cybergenics Corp.* v. *Chinery*,
   330 F.3d 548 (3d Cir. 2003)................................................................. 17, 25, 47

*In re Diocese of Camden, New Jersey*,
   2022 WL 884242 (Bankr. D.N.J. Mar. 24, 2022) .....................................*passim*

*Firefighters' Pension Sys. of City of Kansas City, Missouri Tr.* v.
   *Presidio, Inc.*,
   251 A.3d 212 (Del. Ch. 2021).......................................................................39, 40

*In re Fleurantin*,
   420 F. App'x 194 (3d Cir. 2011)......................................................................31

*Friedberg* v. *Barefoot Architect Inc.*,
   723 F. App'x 100 (3d Cir. 2018)......................................................................38

*In re Fritze LLC*,
   2009 WL 3245499 (Bankr. D.N.J. Oct. 6, 2009)..............................................33

*In re G-I Holdings Inc.*,
   420 B.R. 216 (D.N.J. 2009) .............................................................................17

*In re G-I Holdings, Inc.*,
   2006 WL 1751793 (D.N.J. Aug. 7, 2006) .................................................*passim*

*In re G-I Holdings, Inc.*,
   313 B.R. 612, 629 (Bankr. D.N.J. 2004) .............................................26, 42, 43

*In re George Washington Bridge Bus Station Dev. Venture LLC*,
   2021 U.S. Dist. LEXIS 28601 (S.D.N.Y. 2021)..............................................17

*In re Gibson Grp.*,
   66 F.3d 1436 (6th Cir. 1995)............................................................................43

*In re Gonzalez*,
   342 B.R. 165 (Bankr. S.D.N.Y. 2006)..............................................................31

v

*In re Hall*,
304 F.3d 743 (7th Cir. 2002)..............................................................34

*In re Hechinger Inv. Co. of Delaware*,
327 B.R. 537 (D. Del. 2005), *aff'd*, 278 F. App'x 125 (3d Cir.
2008) ..............................................................................................41

*In re Hechinger Inv. Co. of Delaware*,
274 B.R. 71 (D. Del. 2002).................................................................45

*In re Hudson's Coffee, Inc.*,
2009 WL 1795833 (D.N.J. June 22, 2009)....................................17, 18

*In re Indianapolis Down*,
486 B.R. 286 (Bankr. D. Del. 2013).....................................................52

*In re Jevic Holding Corp.*,
2011 WL 4345204 (Bankr. D. Del. Sept. 15, 2011) ..............................40

*Kelley* v. *Safe Harbor Managed Acct.*,
31 F.4th 1058 (8th Cir. 2022)..............................................................29

*Lee* v. *Pincus*,
2014 WL 6066108 (Del. Ch. Nov. 14, 2014) ........................................40

*In re Lehman Bros. Holdings Inc.*,
469 B.R. 415 (Bankr. S.D.N.Y. 2012)...................................................30

*In re Long Ridge Road*,
2014 WL 886433 (Bankr. D.N.J. Mar. 5, 2014)....................................54

*In re Lyondell Chem. Co.*,
567 B.R. 55 (Bankr. S.D.N.Y. 2017), *aff'd*, 585 B.R. 41 (S.D.N.Y.
2018) ..............................................................................................36

*In re M. Silverman Laces, Inc.*,
2002 WL 31412465 (S.D.N.Y. Oct. 24, 2002)......................................33

*MAC Panel Co.* v. *Va. Panel Corp.*,
283 F.3d 622 (4th Cir. 2002)..............................................................23

*In re Mallinckrodt PLC*,
2024 WL 206682 (Bankr. D. Del. Jan. 18, 2024)..................................27

*Malpiede* v. *Townson*,
780 A.2d 1075 (Del. 2001) ............................................................41

*In re Manley Toys Ltd.*,
2020 WL 1580244 (Bankr. D.N.J. Mar. 31, 2020) ....................................42, 50

*In re Merritt*,
2016 WL 930696 (E.D. Pa. Mar. 10, 2016), *aff'd*, 711 F. App'x 83
(3d Cir. 2017) ............................................................18

*In re Metromedia Fiber Network, Inc.*,
416 F.3d 136 (2d Cir. 2005).............................................23

*In re Millennium Lab Holdings II, LLC*,
945 F.3d 126 (3d Cir. 2019).......................................................*passim*

*In re Mo*,
2024 WL 4003331 (3d Cir. Aug. 30, 2024)...................................26

*In re MRPC Christiana, LLC*,
2019 WL 6652237 (Bankr. D.N.J. Dec. 5, 2019) .............................25

*In re Nine W. LBO Sec. Litig.*,
87 F.4th 130 (2d Cir. 2023)..............................................29

*In re Nine W. LBO Sec. Litig.*,
482 F. Supp. 3d 187 (S.D.N.Y. 2020) .............................................29

*In re Nutraquest, Inc.*,
434 F.3d 639 (3d Cir. 2006)..........................................17

*In re Pembroke Dev. Corp.*,
124 B.R. 398 (Bank. S.D. Fla. 1991).............................................32

*Permanent Mission of India to the United Nations* v. *City of N.Y.*,
551 U.S. 193 (2007)...........................................................30

*In re Prime Realty, Inc.*,
380 B.R. 529 (B.A.P. 8th Cir. 2007) .............................................35

*Prometheus Radio Project* v. *Fed. Commc'ns Comm'n*,
824 F.3d 33 (3d Cir. 2016)..........................................................31

*In re Propex Inc.*,
 415 B.R. 321 (Bankr. E.D. Tenn. 2009) ................................................................32

*In re Quorum Health Corp.*,
 2023 WL 2552399 (Bankr. D. Del. Mar. 16, 2023) ......................................27, 28

*In re R.M.L., Inc.*,
 92 F.3d 139 (3d Cir. 1996) ..................................................................................31

*In re Racing Servs., Inc.*,
 540 F.3d 892 (8th Cir. 2008) ...............................................................................17

*RBC Cap. Mkts., LLC* v. *Jervis*,
 129 A.3d 816 (Del. 2015) ....................................................................................40

*In re Redden*,
 2013 WL 5436368 (Bankr. D. Del. Sept. 30, 2013) ...........................................43

*In re Resorts Int'l, Inc.*,
 181 F.3d 505 (3d Cir. 1999) ................................................................................28

*In re Rite Way Elec., Inc.*,
 510 B.R. 471 (Bankr. E.D. Pa. 2014) ..................................................................35

*In re Roman Cath. Diocese of Rockville Ctr., New York*,
 654 B.R. 212 (Bankr. S.D.N.Y. 2023) ............................................................... 49

*In re S B Bldg. Assocs. Ltd. P'ship*,
 621 B.R. 330 (Bankr. D.N.J. 2020) ...............................................................51, 54

*In re Sabine Oil & Gas Corp.*,
 562 B.R. 211 (S.D.N.Y. 2016) .............................................................................50

*In re Sakhe*,
 2021 WL 5999195 (Bankr. D.N.J. Dec. 17, 2021) .............................................34

*In re Balt. Emergency Servs. II, Corp.*,
 432 F.3d 557 (4th Cir. 2005) ...............................................................................25

*In re Se. Waffles, LLC*,
 460 B.R. 132 (B.A.P. 6th Cir. 2011), *aff'd*, 702 F.3d 850 (6th Cir.
 2012) .....................................................................................................................32

*In re Semcrude, L.P.*,
  728 F.3d 314 (3d Cir. 2013)...........................................................................19

*Skretvedt* v. *E.I. DuPont De Nemours*,
  372 F.3d 193 (3d Cir. 2004)...........................................................................31

*In re Specialty Equip. Cos.*,
  3 F.3d 1043 (7th Cir. 1993)............................................................................23

*In re STN Enters.*,
  779 F.2d 901 (2d Cir. 1985).....................................................................*passim*

*In re TCI 2 Holdings, LLC*,
  428 B.R. 117 (Bankr. D.N.J. 2010).................................................................51

*In re Tribune Co.*,
  464 B.R. 126 (Bankr. D. Del. 2011)................................................................54

*In re Tribune Co. Fraudulent Conv. Litig.*,
  946 F.3d 66 (2d Cir. 2019)........................................................................29, 45

*In re Tribune Media Co.*,
  799 F.3d 272 (3d Cir. 2015)......................................................................23, 24

*In re United Healthcare Sys., Inc.*,
  396 F.3d 247 (3d Cir. 2005) ...........................................................................16

*VFB LLC* v. *Campbell Soup Co.*,
  482 F.3d 624 (3d Cir. 2007).......................................................................31, 32

*In re Washington Mut.*,
  442 B.R. 314 (Bankr. D. Del. 2011)................................................................53

*In re Zenith Elecs. Corp.*,
  258 F.3d 180 (3d Cir. 2001)...........................................................................20

**Statutes**

11 U.S.C. § 101(22A) ......................................................................................28

11 U.S.C. § 101(49)(A).....................................................................................27

11 U.S.C. § 101(54) .........................................................................................29

11 U.S.C. § 546(e) ....................................................................................*passim*

11 U.S.C. § 548(a)(1)(A) ......................................................................38

11 U.S.C. § 548(a)(1)(B) ......................................................................30

11 U.S.C. § 741(7) ................................................................................27

11 U.S.C. §§ 1101(2)(A)-(C) ...............................................................19

11 U.S.C. § 1123(b)(3)(A) ....................................................................51

**Other Authorities**

Fed. R. Bankr. P. 9019..........................................................................51

Joy Wiltermuth, *Why 70% of U.S. corporate bonds still trade at a
    discount*, MarketWatch (July 10, 2024) (*available at*
    https://www.morningstar.com/news/marketwatch/20240710176/w
    hy-70-of-us-corporate-bonds-still-trade-at-a-discount)....................36

Steve V. Mann & Eric A. Powers, *Determinants of Bond Tender
    Premiums and the Percentage Tendered*, 31 J. Banking & Fin. 547,
    557 (2007) ......................................................................................34

x

**INTRODUCTION**

The Bankruptcy Court appropriately rejected the Official Committee of Unsecured Creditors' ("Committee") legally and factually deficient attacks, through its Standing Motion and objections to the Plan releases, on Invitae Corporation's entry into a straightforward debt exchange transaction in March 2023 with holders of the Company's 2024 Convertible Notes (the "March Exchange"). The March Exchange was the result of nearly 11 months of negotiations by Invitae Corporation (with its subsidiaries, "Invitae" or the "Company") and its advisors with respect to a number of potential transactions to address the Company's financial challenges, including negotiations with holders of the Company's 2028 Convertible Notes to explore alternatives to the March Exchange. After determining in late December 2022 that alternative transactions, including proposals for a comprehensive capital structure transaction from holders of the 2028 Convertible Notes, were not in the Company's best interests, the Company entered into the March Exchange, which provided significant benefits to the Company, including:

1.  an effective four-year extension of $305 million of unsecured convertible notes maturing in 2024 to 2028;

2.  a 10% reduction in principal amount of the Company's outstanding debt;

3.  an infusion of $30 million in new money liquidity;

4.  the elimination of a qualified audit opinion in connection with the 2024 maturities; and

1

5.     the capacity for the Company to incur up to $245 million in incremental *pari passu* first-lien secured debt to give the Company the ability to access the debt markets following the March Exchange to address its liquidity needs.

Prior to entering into the March Exchange, the Company's directors and officers carefully considered potential alternatives, the potential costs and risks associated with the March Exchange, and the many benefits the March Exchange would confer on the business. The terms of the March Exchange were the result of an arm's-length negotiation by the Company to implement a transaction on the best terms available. Notably, prior to the Petition Date, no one brought a legal challenge to the March Exchange, and there is no dispute that the March Exchange was permitted under all of the Company's debt documents.

Despite the rigorous process run by the Company to identify the most beneficial transaction and the substantial value received by the Debtors through the March Exchange (none of which was disputed in the proceedings before the Bankruptcy Court), the Committee argued in its Standing Motion that the March Exchange was a constructive fraudulent transfer, an actual fraudulent transfer, and a breach of fiduciary duties by the Debtors' directors and officers allegedly aided and abetted by Deerfield Partners, L.P. (together with its applicable affiliated funds and entities, "Deerfield"), the holder of the largest portion of the exchanged 2024 Convertible Notes.

2

While the Committee's Standing Motion and Proposed Complaint contained ample rhetoric and cursory, unsupported allegations, the Committee failed to state any colorable claims that would warrant granting the Committee standing in the chapter 11 cases. And even if such claims were colorable, the Debtors were entirely justified in releasing any potential claims for the substantial value provided in exchange, which enabled the Company to execute a successful path through the chapter 11 proceedings that maximized value, instead of putting themselves on a path to nowhere through meritless litigation and incurring massive administrative costs along the way.

That is what the Bankruptcy Court concluded after extensive briefings and a full-day evidentiary hearing. Among other things, the Bankruptcy Court found that the Committee's claims faced "significant issues and hurdles," and if the Committee were allowed to bring its proposed claims, it would be "embarking on a senseless enterprise" and cause the Debtors to "jettison[] a confirmable plan supported by significant stakeholders and potentially result[] in significant delays and distributions." (A7977-78.)[1] The Bankruptcy Court therefore denied the Standing Motion "in its entirety." (A8934.) And after another evidentiary hearing

---

[1] This brief cites to the Appendix to the Consolidated Opening Brief filed by the Committee (Dkt. No. 12) ("A") and refers to entries from the Bankruptcy Court docket ("Bankr. Dkt."). Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan (A8935-9085) or Deerfield's objection to the Standing Motion (A2888-971), as applicable.

3

in connection with confirmation of the Plan, the Bankruptcy Court found that the Plan releases were well supported by the record and approved those releases and the Plan.

The Committee's appeal ignores the substantial record on which the Bankruptcy Court found that the Committee's claims and theories are meritless. This appeal continues the Committee's efforts to sabotage the Debtors' chapter 11 transactions while its advisors incur fees that are now being paid directly from unsecured creditor recoveries, after having already misspent millions of dollars of estate resources litigating its baseless Standing Motion and Plan releases objection in the Bankruptcy Court.

As discussed further below, the Committee's appeal is equitably moot because the Plan has been substantially consummated, and granting the Committee's requested relief would fatally scramble the Plan and unfairly harm stakeholders who have justifiably relied on the confirmed Plan. Even if that were not the case, the appeal should be denied on the merits because the Bankruptcy Court properly exercised its discretion in denying the Standing Motion and approving the releases.

## STATEMENT OF THE ISSUES PRESENTED

1.     Whether this appeal should be dismissed because it is equitably moot.

2.     Whether it was within the sound discretion of the Bankruptcy Court to deny the Committee's Standing Motion.

4

3.    Whether it was within the sound discretion of the Bankruptcy Court to approve the releases of claims against Deerfield and other participants in the March Exchange.

## SUMMARY OF THE CASE

**I.    THE COMPANY BEGINS EXPLORING RESTRUCTURING TRANSACTIONS IN 2022.**

As of Spring 2022, the Company had three tranches of funded debt: (1) $350 million of convertible unsecured notes with a September 1, 2024 maturity (the "2024 Convertible Notes"); (2) a $135 million first-lien term loan (the "2024 Secured Term Loan") entered into on October 2, 2020, with a June 1, 2024 maturity; and (3) $1.15 billion in convertible unsecured notes issued by Invitae on April 8, 2021 with an April 1, 2028 maturity (the "2028 Convertible Notes"). (DX5 at *34.) At that time, Deerfield and the Company began discussions around solving the Company's near-term debt maturities, with the parties ultimately agreeing on terms of a transaction in May 2022. (A3016-17.) Ultimately, progress on the deal stalled, and the Company informed Deerfield that it instead intended to explore a comprehensive balance sheet restructuring to address most or all of its outstanding debt. (A3921.)

Throughout 2022, the Company and its advisors evaluated multiple transaction options to restructure the Company's funded debt obligations. (A3954-59.) In November 2022, the Company began soliciting feedback from

5

holders of the 2028 Convertible Notes in connection with a comprehensive capital structure restructuring. (A3961.) Deerfield was not directly involved in those discussions. (A3066.) Despite ongoing engagement by the Company and its advisors, including the exchange of no less than five proposals over the course of three months, talks with holders of the 2028 Convertible Notes proved unproductive. (A3964-4003.) Among other issues, those proposals (i) provided no new capital to the Company, (ii) did not address the upcoming maturity of the 2024 Secured Term Loan, (iii) substantially increased the secured debt on the business, (iv) severely limited the Company's ability to raise new debt, (v) did not materially resolve the "going concern" qualification issue, (vi) attributed an unrealistically high value to the 2028 Convertible Notes, and (vii) was subject to material execution risk, including shareholder approval and the consent of holders of the 2024 Convertible Notes, which were likely to be required to equitize a substantial portion of their holdings. (A4001-18.)

Through these negotiations, the Company and its advisors made clear that they understood that the "easiest" deal would be to extend the 2024 debt maturities, and that "pushing maturity by 2 years is better than doing nothing, and helps us buy a little time." (A3954.) In addition, unless the Company addressed the short-term maturities, it expected its auditor to issue a "going concern" qualification in the Company's audited financial statements after the second quarter of 2023.

6

(A3957-59.)  Aside from a proposed (but unconsummated) exchange transaction in May 2022, Deerfield was not involved in or apprised of these restructuring efforts throughout most of 2022.  (A3066.)

On December 7, 2022, Invitae presented a proposal to Deerfield for a comprehensive restructuring to exchange (i) 80% of the 2024 Convertible Notes for newly issued secured 2027 convertible notes at approximately a 10% principal reduction and (ii) 50% of the 2028 Convertible Notes for unsecured 2028 convertible notes at approximately a 40% principal reduction, but with a higher coupon and more favorable conversion premium.  The proposal also provided for $200 million in new preferred equity financing to retire the 2024 Secured Term Loan.  (A4031-43.) Deerfield was generally receptive to the proposal and the Company's efforts to pursue a comprehensive capital structure solution.  (A4045-48.)

Nevertheless, on December 28, 2022, the Company notified Deerfield that it was pivoting away from a comprehensive restructuring to pursue a transaction that addressed only the 2024 Convertible Notes given their inside maturity and the looming "going concern" issue.  (A4050-51.)  Apart from these two reasons articulated by the Company, Deerfield did not have any understanding as to the reason for the Company's pivot.  Despite the Company's shifting focus, the Company continued its discussions with other noteholders on a potential comprehensive restructuring.  (A3992-99.)

7

## II.    NEGOTIATION OF AND ENTRY INTO THE MARCH EXCHANGE

In early 2023, the Company determined to refocus its efforts on a more targeted deal to address the Company's immediate maturities in 2024. (A4050.) In its negotiations with the Company, Deerfield made significant concessions, including with respect to the amount of additional secured debt the Company could incur and the amount of new capital Deerfield would invest. (A3167, A6629.)

The March Exchange, which included Deerfield and the vast majority of holders of 2024 Convertible Notes (collectively, the "Participating Noteholders"), was announced on February 28, 2023, and closed on March 7, 2023. (A3855.) Primarily, the transaction consisted of (i) the exchange of $305.7 million of existing 2024 Convertible Notes for $275.3 million of new 2028 Senior Secured Notes and $22.9 million of stock and (ii) the issuance of $30 million of new 2028 Senior Secured Notes for $30 million in cash. (A4091.) Immediately prior to the March Exchange, Invitae repaid the 2024 Secured Term Loan (the "Term Loan Repayment"), which carried a minimum variable interest rate of 10.75%. (A2205, A3562, A3571.) Early repayment resulted in estimated net savings of $15.5 million. (*See id.*; A4066.)

Deerfield and Invitae believed that the March Exchange and term loan repayment would create significant equity value for the Company. Among other things, Deerfield believed that addressing the Company's most pressing problem

8

(*i.e.*, the 2024 maturities) would improve the Company's stock price, allowing it to negotiate refinancing terms with holders of the 2028 Convertible Notes from a position of comparative strength and to access equity capital markets as needed. (A3057, A3090-91.)  In addition, the coupon on the new notes was lower than the prevailing SOFR-risk-free rate.  (A2910 n.17.)  The March Exchange also provided for $245 million in additional first-lien secured capacity to allow the Company to obtain additional capital in the debt markets.  (A6623.)

Repayment of the 2024 Secured Term Loan, coupled with the partial exchange of 2024 Convertible Notes for stock, reduced the Company's total outstanding debt by $135.5 million and positioned it with nearly $450 million in cash on hand.  (A2427, A6623.)  In exchange for extended maturity, a discounted coupon rate, and added liquidity, the new notes were secured by a first priority lien on the Company's and its subsidiaries' assets and guaranteed by all of the Company's subsidiaries.  (A4244-45.)

## III. MARKET REACTION TO THE MARCH EXCHANGE AND THE AUGUST EXCHANGE

Following the March Exchange, the market did not respond as the Company and Deerfield had expected.  (A6446-49.)  Deerfield was disappointed by the market's initial reaction but believed that Invitae's share price would improve as it continued to execute its cost-cutting plan and investors gained a better

9

understanding of the additional runway the March Exchange had created.  (A4281-84.)

To further deleverage the Company, and without any agreement in place with Invitae, Deerfield acquired nearly half ($17.2 million) of Invitae's remaining 2024 Convertible Notes on the open market and exchanged the notes (and the interest payments Invitae would otherwise pay) for $16.7 million in stock and $100,000 in 2028 Secured Convertible Notes on August 22, 2023 (the "August Exchange").  (A4291.)  As the Company's financial advisor noted, Deerfield acquired these notes "to be helpful" to the Company so that the Company would not have to use liquidity to pay the remaining stub 2024 Convertible Notes.  (A4295.) Together, the March and August Exchanges reduced the Company's debt burden by more than $150 million.

## IV.    DEERFIELD'S VIEW OF THE COMPANY'S PROSPECTS EVOLVES AS EVENTS UNFOLD.

Although Deerfield believed investors would eventually respond to the retirement of nearly all short-term debt and ongoing cost cuts, the Company's stock price continued to decline over the second half of 2023.  (A6446-49.)  Invitae struggled to cut costs at the rate it had projected, and efforts to sell off nonessential businesses were slower and less lucrative than expected.  (A7572.)

Deerfield's concerns were compounded by the departure of the Company's longtime CFO, Roxi Wen, on June 30, 2023.  (A4298.)  Deerfield

10

viewed Ms. Wen as the primary force behind the Company's cost-saving efforts. (A3209-10.)  Deerfield tried to work with Invitae's remaining executive team in the following months but found that absent Ms. Wen's willingness to make significant cuts, leadership was unable to implement a strategy that would allow the Company to reach breakeven.  (A3211.)

On October 20, 2023, once it became clear that Invitae would not be able to raise new capital and would not be able to address its ongoing cash burn, Deerfield approached Invitae with a preliminary term sheet for a potential restructuring to maximize value to stakeholders rather than deplete its remaining cash.  (A4346-48.)

The Company did not initially engage on the restructuring proposal and instead requested Deerfield's consent under the indenture governing the 2028 Secured Notes (the "2028 Secured Convertible Notes Indenture") to the divestment of certain cash-burning business lines.  (A4352.)  On December 8, 2023, the parties entered into a supplemental indenture through which Deerfield granted those consents and the parties agreed on milestones for a sale process and a time frame to enter into a transaction support agreement for a broader restructuring (the "Second Supplemental Indenture").  (*Id.*)  In exchange for Deerfield's consent, Invitae paid a $2.1 million consent fee (the "Consent Fee").  (*Id.*)

11

Thereafter, as contemplated by the Second Supplemental Indenture, the Company and Deerfield negotiated the terms of a transaction support agreement (the "TSA") to facilitate the implementation of a sale of the Company's assets and distribution of sale proceeds to the Company's stakeholders through an expeditious and efficient chapter 11 proceeding. (A4359-60.) Importantly, the TSA provided the framework for the Plan, including the subordination of their 2028 Senior Secured Claims to the payment in full of all unsecured creditors at each of Invitae's subsidiaries (the "Subsidiary Unsecured Creditors"), and to payment of all unsecured claims included in a convenience class of claims less than $250,000 (the "Convenience Class Creditors").

## V.    THE CHAPTER 11 CASES

On February 13, 2024, the Debtors commenced the chapter 11 cases in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"), with the support of Deerfield pursuant to the terms of the TSA. The chapter 11 cases were financed through the Debtors' continued use of cash collateral, to which Deerfield consented as provided in the TSA, and which allowed the Debtors to continue operations without incurring substantial debtor-in-possession financing fees. (A0048-102.) The Debtors filed a proposed chapter 11 plan (as amended, the "Plan") on May 9, 2024. (A0600.)

12

On May 22, 2024, the Committee filed its motion (the "Standing Motion") seeking derivative standing to pursue several causes of action against Deerfield and the Company's directors and officers ("Proposed Claims"). (A0789.) On July 9, the Bankruptcy Court heard oral arguments regarding the Standing Motion and, on July 12, issued a preliminary ruling denying the Standing Motion. (A7979-80.) Specifically, the Bankruptcy Court found that "significant issues and hurdles" present for the Committee's claims, which, among other things, include: (i) "the significant factual dispute as to whether the debtor was insolvent at the time of the relevant transactions"; (ii) "meaningful factual disputes as to the equivalency of the value received by the debtor from the transactions"; (iii) "the potential availability of safe-harbor defenses under Section 546(e)"; (iv) "the potential risks and costs to the estate in jettisoning a confirmable plan supported by significant stakeholders and potentially resulting in significant delays and distributions"; and (v) "the potential risks and administrative costs and delays associated with pursuing substantive litigation." (A7977-78.) After "account[ing] in the aggregate for the[se] hurdles and issues and obstacles," the Bankruptcy Court "ma[de] a preliminary ruling in favor of the [D]ebtor on the motion filed by the Committee seeking derivative standing." (A7979.) The Bankruptcy Court's preliminary ruling became final on July 23, after hearing further evidence and argument with respect to confirmation of the Plan. (A8416.)

13

On August 2, 2024, the Bankruptcy Court entered an order confirming the Plan (the "Confirmation Order"). (A8799.) The Plan included, among other provisions, releases by the Debtors of any and all claims against certain third parties (including Deerfield and U.S. Bank Trust Company, National Association ("U.S. Bank") as the indenture trustee and collateral agent for the 2028 Senior Secured Notes) (the "Debtor Releases"). (A9215.) The Bankruptcy Court found that the Debtor Releases "(i) represent a sound exercise of the Debtor's business judgment; (ii) were negotiated in good faith and at arm's length; and (iii) are (a) in exchange for good and valuable consideration, (b) a good faith settlement and compromise of the claims released thereby, (c) in the best interest of the Debtors and their Estates, (d) fair, equitable, and reasonable under the circumstances of the Debtors' Chapter 11 Cases, … [and] (f) … integral elements of the transactions incorporated into the Plan and inextricably bound with the other provisions of the Plan." (A8824.) On the same day, the Bankruptcy Court entered a written order denying the Standing Motion "in its entirety for the reasons stated in the Court's bench decision read into the record on July 12, 2024." (A8934.) This appeal ensued. (A9229.)

## SUMMARY OF ARGUMENT

The Bankruptcy Court properly denied the Standing Motion and granted the Debtor Releases. None of the Committee's arguments on appeal identifies any legal or factual basis to disturb the Bankruptcy Court's rulings.

14

***First***, this appeal is equitably moot.  The Plan has been substantially consummated, and granting the Committee's requested relief—which includes unwinding distributions made under the Plan and nullifying the Debtor Releases granted as part of the Confirmation Order—would fatally scramble the Plan and would be prejudicial to stakeholders that have justifiably relied on the confirmed Plan.

***Second***, even if this appeal were not equitably moot, the Bankruptcy Court exercised its sound discretion in denying the Standing Motion because the Committee's Proposed Claims were not colorable, and the Debtors' decision not to pursue those meritless claims was justified.  Contrary to the Committee's suggestion, the Bankruptcy Court denied the Standing Motion "in its entirety" and did not silently accept that the Proposed Claims were colorable—which in any event they are not.  As to the Committee's contention that the Bankruptcy Court erred by failing to make specific findings of fact to support its unjustifiability findings, the record shows otherwise.  The Bankruptcy Court examined each of the five factors that courts in this Circuit consider in the cost-benefit analysis of whether to grant derivative standing—as set forth in the only decision the Committee cited in support of its argument—and correctly concluded that the Committee had failed to show that the Debtors unjustifiably refused to pursue the Proposed Claims.

15

***Third***, the Bankruptcy Court appropriately granted the Debtor Releases. Deerfield and the other Released Parties made substantial contributions and provided significant value to the Debtors and provided innumerous value to the Debtors in their reorganization efforts both before and after the Petition Date. The Bankruptcy Court's decision to uphold Debtor Releases correctly reflects that those releases more than meet the applicable standard of "exceed[ing] the lowest point in the range of reasonableness."

## STANDARD OF REVIEW

A district court reviews "the bankruptcy court's legal determinations de novo, its factual findings for clear error[,] and its exercise of discretion for abuse thereof." *In re United Healthcare Sys., Inc.*, 396 F.3d 247, 249 (3d Cir. 2005); (Opening Br. ("OB") 2.)

Here, the Bankruptcy Court's denial of derivative standing and its grant of releases under the Plan are each an exercise of equitable powers. *See Cybergenics Corp.* v. *Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (A decision granting or denying "derivative standing upon creditors' committees is a straightforward application of bankruptcy courts' equitable powers."); *In re Hudson's Coffee, Inc.*, 2009 WL 1795833, at *2 (D.N.J. June 22, 2009) ("Approving a proposed settlement" is a quintessential example of "where the Bankruptcy Court has exercised discretion in making its determination."). This Court should therefore review both decisions for

16

abuse of discretion. *See, e.g.*, *In re George Washington Bridge Bus Station Dev. Venture LLC*, 2021 U.S. Dist. LEXIS 28601, at *7 (S.D.N.Y. 2021) (reviewing a "bankruptcy court's ruling on derivative standing" for "abuse of discretion" because it represents an application of its equitable powers); *In re Racing Servs., Inc.*, 540 F.3d 892, 901 (8th Cir. 2008) (same); *In re Consol. Nevada Corp.*, 2017 WL 6553394, at *4 (B.A.P. 9th Cir. Dec. 21, 2017), *aff'd*, 778 F. App'x 432 (9th Cir. 2019) (same); *In re G-I Holdings Inc.*, 420 B.R. 216, 256-57 (D.N.J. 2009) (applying Bankruptcy Rule 9019's standards in approving a section 1123(b)(3)(A) release); *In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006) (reviewing a bankruptcy court's decision to approve settlements under Rule 9019 for abuse of discretion).

Because the Bankruptcy Court's denial of the Standing Motion and approval of the releases were both exercises of its sound discretion, this Court should leave those decisions undisturbed "unless there is a definite and firm conviction that the bankruptcy court … committed clear error of judgment in the conclusion it reached upon weighing the relevant factors," resulting in "a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *In re Boy Scouts of Am. & Delaware BSA, LLC*, 650 B.R. 87 (D. Del. 2023); *Hudson's Coffee*, 2009 WL 1795833, at *2 (same).

Even if the applicable standard were *de novo* (as the Committee has asserted), for the same reasons discussed below, this Court should still affirm the

17

Bankruptcy Court's ruling that the Committee failed to carry its burden with respect to the Standing Motion and that the Debtor Releases were appropriate.[2]

## ARGUMENT

### I.    THE COMMITTEE'S APPEAL SHOULD BE DISMISSED AS EQUITABLY MOOT.

Courts dismiss appeals of bankruptcy court orders as equitably moot where "effective relief could conceivably be fashioned, [but] implementation of that relief would be inequitable." *In re Cont'l Airlines*, 91 F.3d 553, 559 (3d Cir. 1996). In the Third Circuit, courts evaluating whether an appeal is equitably moot consider "(1) whether a confirmed plan has been substantially consummated; and (2) if so, whether granting the relief requested in the appeal will (a) fatally scramble the plan and/or (b) significantly harm third parties who have justifiably relied on plan confirmation." *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 140 (3d Cir. 2019). Here, these factors strongly support a finding that the Committee's appeal is equitably moot.

### A.    The Plan Has Been Substantially Consummated.

There can be no dispute that the Plan has been consummated, as the Committee acknowledges in its brief. (OB 13 ("[T]he Official Committee does not

---

[2]    As discussed below, courts in the Third Circuit apply a two-pronged analysis to a motion for derivative standing. Although some courts have analyzed the "colorability" prong of the derivative standing test under the *de novo* standard of review, those decisions are non-binding on this Court and in any event do not apply to standard of review with respect to the "justifiability" prong of the analysis, *i.e.*, whether the decision not to pursue the claims was justifiable, which is governed by the abuse of discretion standard. *See, e.g.*, *In re Merritt*, 2016 WL 930696, at *5-6 (E.D. Pa. Mar. 10, 2016) (reviewing justifiability prong for abuse of discretion), *aff'd*, 711 F. App'x 83 (3d Cir. 2017).

seek to unwind the distributions already made under the **consummated** Plan." (emphasis added)).)  Under the Bankruptcy Code, substantial consummation occurs upon the (A) "transfer of all or substantially all of the property proposed by the plan to be transferred"; (B) "assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan"; and (C) "commencement of distribution under the plan." 11 U.S.C. §§ 1101(2)(A)-(C); *see In re Semcrude, L.P.*, 728 F.3d 314, 321 (3d Cir. 2013).

Here, the Plan became effective on August 7, 2024.  (Bankr. Dkt. No. 1092.)  Substantial plan distributions were made on the Effective Date, including distribution of $240 million to holders of First Lien Secured Notes and additional distributions since the Effective Date.  (*Id.* at *7.)  All assets of the Debtors not distributed on the Effective Date were vested in the Wind-Down Debtors to be administered by the Plan Administrator in accordance with the Plan.  (A8280.) Courts have held that a Plan has been substantially consummated in similar circumstances.  *See, e.g.*, *In re Allied Nev. Gold Corp.*, 725 F. App'x 144, 150 (3d Cir. 2018) (affirming finding of substantial consummation where the debtor "transferred substantially all of its property by satisfying certain debt obligations, eliminating all then-existing liens, and dissolving certain business entities …, [and] had commenced distributions under the plan."); *In re Zenith Elecs. Corp.*, 258 F.3d

19

180, 185-86 (3d Cir. 2001) (finding substantial consummation where "all property had been transferred, all managerial changes had occurred, and virtually all of the distributions had been made").

**B.    Granting the Committee's Requested Relief Would Fatally Scramble the Plan and Harm Third Parties Who Have Justifiably Relied on Confirmation of the Plan.**

If a plan has been substantially consummated, courts in the Third Circuit dismiss an appeal as equitably moot if the relief requested would "fatally scramble the plan" or "significantly harm third parties who have justifiably relied on plan confirmation."  *Millennium Lab*, 945 F.3d at 140.  That is precisely what would happen if the Court were to grant the Committee's requested relief.

***First***, the Committee seeks standing to pursue estate claims to try to avoid liens and transactions that occurred in March 2023, reverse distributions already made under the substantially consummated Plan, and redistribute the proceeds of the sale of the Debtors' assets.  (OB 28 n.17 ("[A]ny estate claims and causes of action against the Secured Noteholders would serve only to reallocate the distribution of a pot of cash."); 17 ("[T]he Official Committee seeks to avoid the liens granted in the Uptier Transaction."); 22 ("Avoiding the liens provided … in the Uptier Transaction would return all originally unsecured funded debt creditors … to an equal position.").)  Regardless of the Committee's framing, the goal of this appeal

20

is to scramble the consummated plan and "unwind the distributions already made." (*Id.* at 13.)

*Second*, granting the Committee's request would require vacatur of the Confirmation Order. The Confirmation Order provides that "each Releasing Party … is deemed to have … released and discharged each Debtor, Wind-Down Debtor, and Released Party from any and all Claims and Causes of Action." (A8851-52 ¶ 100.) This is an integral and nonseverable part of the Plan. (*See, e.g.*, A8869 ¶ 135 ("Each term and provision of the Plan, as it may have been amended by the Confirmation Order, is (i) valid and enforceable pursuant to its terms, (ii) integral to the Plan, and (iii) nonseverable and mutually dependent.").) The Committee's argument that it does not seek to vacate the Confirmation Order is simply belied by the express terms of the Order itself.

*Third*, the Committee's requested relief cannot be achieved without effectively mandating the Debtors renege on the concessions and compromises underpinning the Plan after obtaining all of the benefits. The Debtors negotiated and entered into the TSA, which was the cornerstone of the eventual Plan, after an extensive cost-benefit analysis. On one hand, the TSA (i) promised payment in full to nearly all unsecured creditors (including every unsecured trade creditor) regardless of the total sale proceeds; (ii) secured Deerfield's consent to use cash collateral to fund these cases; (iii) allowed for payment in full of all administrative

fees prior to any recovery by secured creditors; (iv) set the framework and milestones for the sale and auction process that led to the sale of substantially all of the Debtors' assets; and (v) allowed Deerfield to credit bid in the auction, driving up the sale price. (A0735.)

On the other hand, in exchange for these concessions by Deerfield and to avoid costly litigation, the TSA provided for the consensual releases ultimately embodied in the Plan and Confirmation Order. Allowing the Committee to cherry-pick aspects of the Plan that it prefers after the fact—while nullifying Plan releases on which the parties relied in consenting to the Plan as a whole—would be inequitable and give the Committee a "windfall" at the expense of other constituents. *Millennium Lab*, 945 F.3d at 143-44 (affirming dismissal and concluding that striking releases without returning contributions made by consenting parties was "a fantasy" that would give appellant a windfall at the expense of the cooperating parties).

Where, as here, releases are essential to plan confirmation and a product of arm's length negotiations, the Third Circuit has held that equitable rescission cannot be achieved without unwinding the entire plan. *See In re Tribune Media Co.*, 799 F.3d 272, 280-81 (3d Cir. 2015) (settlement of claims was "a central issue in the formulation of a plan," and "allowing the relief the appeal [sought] would effectively undermine the Settlement … and, as a result, recall the entire Plan for a redo");

22

*accord In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 145 (2d Cir. 2005); *MAC Panel Co.* v. *Va. Panel Corp.*, 283 F.3d 622, 626 (4th Cir. 2002); *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1049 (7th Cir. 1993).

***Finally***, in addition to fatally scrambling the Plan, this appeal would "significantly harm the interests of third parties who have justifiably relied on plan confirmation." *Tribune*, 799 F.3d at 278. Pursuant to the consummated Plan, the estates have made substantial distributions to Senior Secured Noteholders and to Convenience Class Creditors. As described above, the Committee's appeal would eviscerate the Plan and create significant uncertainty as to those distributions, when the recipients have relied on the finality of those distributions (including in the absence of a stay). *Id.* at 287; *Millennium Lab*, 945 F.3d at 140 (noting the court's vested interest in encouraging reliance on the "finality and reliability of consummated plans"). This appeal also would disrupt the compromises agreed to by Deerfield and the Debtors (and other third parties) that formed the basis for the Plan, on which those parties (and all beneficiaries of the Plan, including all creditors) have now relied.

Because the Plan has been substantially consummated and granting the Committee's requested relief would fatally scramble the Plan and unfairly harm third parties that have justifiably relied on the Plan and its consummation, this Court should dismiss this appeal as equitably moot.

23

## II.    THE BANKRUPTCY COURT EXERCISED ITS SOUND DISCRETION IN DENYING THE STANDING MOTION.

The Bankruptcy Court held that the Committee failed to meet its burden to obtain derivative standing to pursue the Proposed Claims.  (A7979-80, A8416.) This decision was a proper exercise of the Bankruptcy Court's discretion because (1) the Committee failed to meet its burden to show that its proposed claims were colorable; and (2) the Debtors' decision not to pursue the Proposed Claims was justified.

### A.    The Committee Failed to Carry Its Burden to Show Both That the Proposed Claims Were Colorable and That the Debtors Have Unjustifiably Refused to Bring Them.

As a general matter, a debtor-in-possession controls the prosecution of all estate claims in a chapter 11 proceeding consistent with its "fiduciary duty to maximize the value of the bankruptcy estate."  *Cybergenics*, 330 F.3d at 573. Derivative standing is "an implicit exception to the 'general rule'" that the debtor-in-possession holds "the privilege of prosecuting various actions on behalf of the estate."  *In re Balt. Emergency Servs. II, Corp.*, 432 F.3d 557, 560 (4th Cir. 2005). This exception only comes into play when the Bankruptcy Code's "envisioned scheme breaks down."  *Cybergenics*, 330 F.3d at 553.

To determine whether such a breakdown has occurred, courts require a party seeking derivative standing to pursue estate claims to establish that (1) colorable claims exist; and (2) the debtor has unjustifiably refused to bring those

24

claims.  *See In re STN Enters.*, 779 F.2d 901, 905 (2d Cir. 1985).  It is the movant's "burden in the first instance to demonstrate it satisfies these prerequisites for derivative standing."  *In re MRPC Christiana, LLC*, 2019 WL 6652237, at *10 (Bankr. D.N.J. Dec. 5, 2019).

### B.     The Committee Failed to Establish That the Proposed Claims Were Colorable.

To assess whether a claim is colorable, the court must determine if the movant "has asserted claims for relief that on appropriate proof would support a recovery."  *In re G-I Holdings, Inc.*, 313 B.R. 612, 631 (Bankr. D.N.J. 2004).  In many ways, "[t]his inquiry is like that of a motion to dismiss for failure to state a claim."  *In re Diocese of Camden, New Jersey*, 2022 WL 884242, at *4 (Bankr. D.N.J. Mar. 24, 2022).  Unlike a motion to dismiss, however, the court should also "examine the facts for any dispositive affirmative defenses and may deny a motion for standing when an affirmative defense appears on its face."  *Id.*; *see also ALA, Inc.* v. *CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994) (same).

Here, the Committee failed to establish that the Proposed Claims were colorable.[3]

---

[3]    Contrary to the Committee's unsupported assertions on appeal, the Bankruptcy Court did not "accept" that the Proposed Claims were colorable.  (OB 11-12.)  Instead, the Bankruptcy Court stated in its August 2, 2024 order that "[t]he Standing Motion is DENIED *in its entirety*."  (A8934 (emphasis added).)  In any event, the Committee is simply wrong to shift the burden to require the *Bankruptcy Court* to expressly find that the Proposed Claims were not colorable.  That is not the standard.  *Cf. G-I Holdings*, 313 B.R. at 629 ("[I]t is the committee's burden in the first instance to demonstrate that it has satisfied the test for derivative standing.").  Moreover, as set forth *infra*, the Bankruptcy Court clearly found that the Committee failed to show that the Debtors' refusal to pursue the Proposed Claims was unjustifiable, which alone is sufficient to affirm the denial of the Standing Motion.  *In re Mo*, 2024 WL

**1. The Committee's Claim That the March Exchange Was a Constructive Fraudulent Transfer Was Not Colorable.**

**(a)    The March Exchange Is Protected by the Section 546(e) Safe Harbor.**

Section 546(e) of the Bankruptcy Code provides that, other than in cases of actual fraud, "the trustee may not avoid … a transfer made by or to (or for the benefit of) a … financial institution [or] financial participant" where that transfer is also (1) a "settlement payment" or a "transfer payment" that is (2) made "in connection with a securities contract."  In simpler terms, the safe harbor "applies when two requirements are met:  (1) there is a *qualifying transaction* (*i.e.*, there is a settlement payment or a transfer payment … made in connection with a *securities contract*), and (2) there is a *qualifying participant* (*i.e.*, the transfer was made by or to (or for the benefit of) a … *financial institution*, or *financial participant*)."  *In re Quorum Health Corp.*, 2023 WL 2552399, at *5 (Bankr. D. Del. Mar. 16, 2023) (emphasis added); *In re Mallinckrodt PLC*, 2024 WL 206682, at *14 (Bankr. D. Del. Jan. 18, 2024).  Both requirements are met here.

(1)    The March Exchange Was a Qualifying Transaction and Deerfield Was a Qualifying Participant.

***First***, the March Exchange was a "qualifying transaction" because it was a "settlement payment … made in connection with a securities contract."

---

4003331, at *1 (3d Cir. Aug. 30, 2024) (An appellate court may affirm a bankruptcy court's decision "on any grounds supported by the record.").

26

*Quorum*, 2023 WL 2552399, at \*5. The Bankruptcy Code's definition of "securities contract" includes "a contract for the purchase [or] sale … of a security … [or] any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph." 11 U.S.C. § 741(7). The term "security" is broadly defined in the Bankruptcy Code to include, among others, notes, stocks, bonds, debentures, and any "other claim or interest commonly known as 'security.'" 11 U.S.C. § 101(49)(A). The common stock and notes transferred in the March Exchange are both securities under section 101(49)(A). The transfer of cash and securities associated with the March Exchange was also a "settlement payment," which the Third Circuit has defined as "the deposit of cash by the purchaser or the deposit or transfer of the securities by the dealer." *In re Resorts Int'l, Inc.*, 181 F.3d 505, 515 (3d Cir. 1999) .

***Second***, Deerfield was a "qualifying participant" because it was a "financial participant," defined in the Bankruptcy Code as "an entity that, at the time it enters into a securities contract …, has gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more such agreements or transactions with the debtor or any other entity (other than an affiliate) at such time or on any day during the 15-month period preceding the date of the filing of the petition." 11 U.S.C. § 101(22A).

27

As the Proposed Complaint acknowledges, Deerfield held a gross mark-to-market position of $100 million or more in securities contracts at all relevant times. (*See* A0950-51; A0943 (stating that Deerfield "has held the majority of the 2024 Unsecured Notes since at least August 2022"); A0938-39 ("Deerfield Partners, L.P. is the holder of 78% of the 2028 Senior Secured Notes.").) Deerfield also submitted an SEC filing to the Bankruptcy Court showing that as of December 31, 2023, Deerfield maintained multiple positions of $100,000,000 or more in notes or common stock with an aggregate value of $5,415,638,759. (A6631-35.) *See Quorum*, 2023 WL 2552399, at *7 n.45 (taking judicial notice of a fact contained in an SEC filing when considering a motion to dismiss). As such, Deerfield was a qualifying financial participant.[4]

> (2)   The Committee Cannot Circumvent the Safe Harbor by Only Attacking the March Exchange Liens.

The Committee does not dispute that the March Exchange was a qualifying transaction or that Deerfield was a qualifying participant. (*Cf.* OB 17-18.) Instead, the Committee argues that the safe harbor does not apply because the Committee only "seeks to avoid the liens granted in the [March Exchange], not to

---

[4]   Courts have also held that a transferor's use of an intermediary financial institution in connection with a securities contract qualifies the transferor itself as a financial institution for purposes of the safe harbor. *See, e.g.*, *Kelley* v. *Safe Harbor Managed Acct.*, 31 F.4th 1058, 1065 (8th Cir. 2022); *In re Nine West LBO Sec. Litig.*, 482 F. Supp. 3d 187 (S.D.N.Y. 2020). Here, Invitae was also a qualifying participant, because Invitae carried out the March Exchange through a financial institution, U.S. Bank, as the trustee and collateral agent. *See In re Nine W. LBO Sec. Litig.*, 87 F.4th 130, 146 (2d Cir. 2023) (safe harbor applies to transfers made by or to customers of financial institutions); *Tribune*, 946 F.3d at 77-80 (same).

invalidate the transfer of a security." (OB 17.) But section 546(e) does not only protect particular elements of a securities contract; it protects *any* transfer made by or to a qualifying participant so long as the transfer is "'*related to*' or '*associated with*' [a] securities contract." *In re Bernard L. Madoff Inv. Sec.*, 773 F.3d 411, 421 (2d Cir. 2014) (emphasis added).

The liens the Committee seeks to invalidate are "transfers." *See* 11 U.S.C. § 101(54) (defining "transfer" to include: "(A) the creation of a lien; … (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest in property"); *Permanent Mission of India to the United Nations* v. *City of N.Y.*, 551 U.S. 193, 198 (2007) (liens are "interests in property"). And, as the Committee repeatedly acknowledges, these transfers were "related to" or "associated with" the March Exchange Agreement—a securities contract. (*See* OB 17 ("[T]he Official Committee seeks to avoid the liens granted in the [March Exchange].").) Section 546(e)'s safe harbor therefore plainly bars the Committee's requested relief no matter how it is framed. *See In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 443-44 (Bankr. S.D.N.Y. 2012) (rejecting a similar claim as a "creative effort[] to craft theories of recovery that are outside the ambit of the safe harbors" and a "means to whittle away at or undermine the effectiveness of the safe harbors").

29

> **(b)    The Committee Failed to Establish the Elements of a Constructively Fraudulent Transfer Claim.**

Even if it were not barred by section 546(e), the Committee's proposed constructive fraudulent transfer claim would not be colorable. A transfer may be deemed constructively fraudulent if (1) a debtor did not receive reasonably equivalent value in exchange for the transfer *and* (2) the debtor was insolvent at the time of the transaction or became insolvent as a result of the transaction. 11 U.S.C. § 548(a)(1)(B)(ii).

As discussed below, the March Exchange provided significant value to the Company, and the Company was solvent at the time of the March Exchange under each of the three tests of solvency.[5]

> (1)    <u>The Debtors Received Reasonably Equivalent Value in the March Exchange.</u>

A party receives reasonably equivalent value when it "gets 'roughly the value it gave.'" *VFB LLC* v. *Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) (internal citation omitted). To make this determination, courts often look to the totality of the circumstances, considering (i) "the good faith of the transferee,"

---

[5]    Because the Committee has not raised arguments on appeal concerning any Proposed Claims relating to the August Exchange, the Consent Fee, or the Purported Unencumbered Assets, it has waived those arguments for purposes of its appeal. *Skretvedt* v. *E.I. DuPont De Nemours*, 372 F.3d 193, 202–03 (3d Cir. 2004) (In federal courts, it is axiomatic that "an issue is waived unless a party raises it in its opening brief" and even "a passing reference to an issue will not suffice to bring that issue before this court."); *see also In re Fleurantin*, 420 F. App'x 194, 197 n.4 (3d Cir. 2011) ("[I]ssues raised for the first time [in a reply brief] are waived."); *In re Coinbase Glob., Inc. Sec. Litig.*, 2024 WL 4053009, at *14 n.20 (D.N.J. Sept. 5, 2024) (same); *Prometheus Radio Project* v. *Fed. Commc'ns Comm'n*, 824 F.3d 33, 53 (3d Cir. 2016) (same). As briefed in the proceedings below, any such Proposed Claims also fail. (A2888-2971.)

(ii) "the fair market value compared to the price paid," and (iii) "whether the transaction was at arm's-length." *In re R.M.L., Inc.*, 92 F.3d 139, 145 (3d Cir. 1996). Fair market value does not require a "penny for penny exchange," but if the debtor receives value that is "so low that it shocks the conscience" courts may presume the transfer was for less than reasonably equivalent value. *In re Gonzalez*, 342 B.R. 165, 173 (Bankr. S.D.N.Y. 2006).

The Committee concedes that the March Exchange was negotiated at arm's length. (A0900.) These negotiations yielded (i) the exchange of $305.7 million of 2024 Convertible Notes for $275.3 million of new secured convertible notes maturing in 2028 and $22.9 million of stock; and (ii) the issuance of $30 million of new 2028 Senior Secured Notes for $30 million in cash. From the plain terms of the March Exchange, it is evident that Invitae received *more* than "roughly the value it gave" by satisfying antecedent debt. *VFB*, 482 F.3d at 631; *see also In re Propex Inc.*, 415 B.R. 321, 324 (Bankr. E.D. Tenn. 2009) (debtor received reasonably equivalent value because payment reduced principal balance of debt "dollar-for-dollar"); *In re Se. Waffles, LLC*, 460 B.R. 132, 140 (B.A.P. 6th Cir. 2011), *aff'd*, 702 F.3d 850 (6th Cir. 2012) (same).

The March Exchange and related Term Loan Repayment also (i) extended or retired nearly all of the Company's short-term debt, (ii) significantly reduced total outstanding debt, (iii) provided $30 million of new working capital,

31

(iv) allowed for $245 million of additional secured debt capacity, and (v) defused the risk of a looming "going concern" qualification that could have resulted in a free-fall bankruptcy.  Courts consider these features as "value" for purposes of section 548 of the Bankruptcy Code.  *See, e.g.*, *Anand* v. *Nat'l Republic Bank*, 239 B.R. 511, 518-19 (Bankr. N.D. Ill. 1999) (concluding that debtor received reasonably equivalent value when bank agreed to extend maturity in return for collateral to secure loans); *In re Pembroke Dev. Corp.*, 124 B.R. 398, 400-01 (Bank. S.D. Fla. 1991) (fair consideration included, among other things, deferring interest payments and extending maturity date on original loan); *In re M. Silverman Laces, Inc.*, 2002 WL 31412465, at *6 (S.D.N.Y. Oct. 24, 2002) (transactions that collateralized antecedent debt in exchange for maturity extension provided reasonably equivalent value); *In re Fritze LLC*, 2009 WL 3245499, at *7 (Bankr. D.N.J. Oct. 6, 2009) (same).

Attempting to minimize the benefits the Debtors received from the March Exchange, the Committee incorrectly asserts that Invitae gave approximately $100 million more than it received. (OB 19-20.) To arrive at this inaccurate number, the Committee includes payments to third parties for unrelated or unconsummated transactions and assigns exaggerated value to purported "benefits" provided by the Company that in fact have little to no actual value for purposes of the analysis, including:

- ***$8.1 million in Term Loan prepayment fee***. Invitae made the "$8.1 million … prepayment fee in connection with the *[2024] Term Loan* [r]epayment." (A0982.) The Committee includes this fee in its calculation of the value given in the *March Exchange* despite the fact that no amount of these *2024 Term Loan* prepayment fees was paid to the Participating Noteholders who held the *2024 Unsecured Notes*. Early repayment resulted in estimated *net savings* of $15.5 million after accounting for prepayment penalties and a 13.51% interest rate at the time of prepayment. (A2205, A3562, A3571, A4066.)

- ***$19.9 million of debt issuance cost***. The Committee has never provided a source for this supposed cost nor explained why the cost has continued to grow in subsequent briefings. Regardless, fees paid for legal and consulting services in connection with the March Exchange *and* for negotiations of prior, unconsummated transactions do not constitute consideration to the Participating Noteholders and are not relevant to the analysis of reasonably equivalent value, particularly given that $18.1 million of those fees were paid to *the Company's own advisors*. (A4364.)

- ***$27.5 million Make Whole Amount***. The $27.5 million Make Whole Amount was a *contingent* claim under the 2028 Secured Convertible Notes Indenture *at the time of the March Exchange*, and therefore had no value at the time of the March Exchange. *See, e.g.*, *In re Sakhe*, 2021 WL 5999195, at *51 (Bankr. D.N.J. Dec. 17, 2021) ("Value and reasonably equivalent value are measured at the time of the transaction.") (citation omitted); *In re Hall*, 304 F.3d 743, 748 (7th Cir. 2002) ("[Legal claims] are contingent assets whose value must be assessed in light of the probability that they will be realized."). Furthermore, the Make Whole was disallowed by the Bankruptcy Court (A8416-24), and Deerfield did not appeal that ruling.

- ***$35 million "premium" paid for the 2024 Unsecured Notes***. The Committee belatedly argued in its reply brief below that Invitae could have purchased 80% of its outstanding near-term debt on the open market *at the pre-exchange market price*. That is not how markets work. Setting aside the Committee's contention that a cash-strapped company should have bought back hundreds of millions of dollars of notes (which the Committee previously characterized as "soon to be worthless" and "largely illiquid") on the open market, if Invitae had attempted the Committee's proposed

strategy, it would have needed to bid significantly more than the prevailing market price in order to retire *any* significant portion of its debt through market purchases—much less 80% of it. *See* Steve V. Mann & Eric A. Powers, *Determinants of Bond Tender Premiums and the Percentage Tendered*, 31 J. Banking & Fin. 547, 557 (2007) (noting the positive relationship between the percentage of bonds an issuer repurchases on the open market and the premium the issuer pays). That simple fact is further supported by the evidence in the record that the post-exchange market price of the remaining notes was 12% higher than the price on the day the exchange was announced. (A6449.)

The Committee has yet to make a serious attempt to explain its purported calculations, which notably have changed with each round of briefing.[6]

> (2)    Invitae Was Not Insolvent When the March Exchange Was Executed.

Even if the Bankruptcy Court had found that Invitae did not receive reasonably equivalent value in the March Exchange, the Committee's fraudulent transfer claims are not colorable because the Company was not insolvent at the time of the March Exchange. Insolvency is not presumed in fraudulent transfer actions. *In re Rite Way Elec., Inc.*, 510 B.R. 471, 482 (Bankr. E.D. Pa. 2014). Rather, the movant bears the burden of showing insolvency. *See In re Prime Realty, Inc.*, 380 B.R. 529, 534-5 (B.A.P. 8th Cir. 2007).

In its Standing Motion, the Committee invented a solvency analysis that, if accepted, would render dozens of S&P 500 companies insolvent. (A0900-01

---

[6]    *Compare* A0982 (identifying eight costs Invitae allegedly incurred in relation to the March Exchange) *with* OB at 20 (listing four such costs, increasing the purported value of one of these costs without explanation, and, in a footnote, adding a newly identified cost of "approximately" $35 million).

34

at ¶ 95 (alleging Invitae "reported it was insolvent" simply because the book value of its liabilities exceeded that of its assets); A2924 at ¶ 51 n.26 (listing multi-billion dollar companies the Committee's test would declare insolvent).)  In its reply brief, the Committee went one step further, suggesting that Invitae was insolvent because its debt was valued at less than par at the time of the March Exchange.  (A7606 at ¶ 30.)  That standard is simply unworkable and would deem most major American corporations insolvent.  *See, e.g.*, Joy Wiltermuth, *Why 70% of U.S. corporate bonds still trade at a discount*, MarketWatch (July 10, 2024) (*available at* https://www.morningstar.com/news/marketwatch/20240710176/why-70-of-us-corporate-bonds-still-trade-at-a-discount).  Simply put, accepting the "tests" the Committee has invented would lead to absurd outcomes and is not supported by any authority.

Instead, an actual insolvency determination must be made through one of the three relevant tests:  (i) the Balance Sheet Test, (ii) the Capital Adequacy Test, and (iii) the Cash Flow Test.  *In re Lyondell Chem. Co.*, 567 B.R. 55, 98 (Bankr. S.D.N.Y. 2017), *aff'd*, 585 B.R. 41 (S.D.N.Y. 2018).  As Deerfield argued extensively below, none of these tests support the conclusion that Invitae was insolvent at the time of the March Exchange.  (A2923-31.)

On appeal, the Committee does not discuss any of the three insolvency tests.  Rather, it argues in a conclusory fashion that "[t]he Debtors and Deerfield

presented no evidence that overcame [its insolvency] allegations, which had to be taken as true at this stage." (OB 19.) Again, the Committee's argument is contradicted by the record.

Among other things, the evidence in the proceedings below shows that sophisticated investors believed not only in the Company's *solvency*, but also in the *significant equity upside* of the convertible securities they held. (A6530 (internal Deerfield model forecasting conversion of the notes, resulting in a multiple on investment of 1.64 and an internal rate of return of 9.5%).) The Company's stock price also shows that equity investors believed that at the time of the March Exchange, the value of the Company's assets exceeded its liabilities by over $500 million. (A6449.) Just six months before the March Exchange, the Company's stock price surged by 277% overnight following the announcement of major cost-cutting measures and a surprise earnings beat. (A6452.) And after the exchange, the market value of the remaining 2024 Unsecured Notes (which were not exchanged into secured notes) *increased* from $0.79 on the dollar the day before the exchange to $0.89 cents the day after, indicating a belief by investors that the notes had a high likelihood of repayment. (A6449.)

In short, ample evidence demonstrates that Invitae was not insolvent at the time of the March Exchange, and the Committee's conclusory assertions to the contrary should be disregarded.

36

### 2. The Committee's Claim That the March Exchange Was an Actual Fraudulent Transfer Was Not Colorable.

The Committee sought standing in the Bankruptcy Court to pursue actual fraudulent transfer claims with respect to the March Exchange, but the only discernable reference to such a claim in its Appellant's Brief is a simple statement that the claim is not barred by section 546(e).  (OB 8, 17.)  That is because there is in fact no factual basis for a claim of actual fraud.  Moreover, the argument misses the point—Deerfield has never argued that section 546(e)'s safe harbor applies to actual fraudulent transfer claims.

To avoid the March Exchange as actually fraudulent, the Committee was required to show that Invitae acted with "actual intent to hinder, delay, or defraud."   11  U.S.C. § 548(a)(1)(A).   "[C]onclusory allegations w[ould] not suffice," and the Committee needed to "state with particularity the circumstances constituting fraud."  *Friedberg* v. *Barefoot Architect Inc.*, 723 F. App'x 100, 103 (3d Cir. 2018).

The Committee did not come close to meeting this high bar.  For starters, the Committee has conceded that "the March Exchange was negotiated at arm's length." (A0900.)  Moreover, the record shows that the March Exchange was in fact negotiated and carried out in good faith.  If, as the Committee alleges, "[a]ll parties knew that the transaction would only exacerbate the Debtors['] liquidity issues and likely lead to a chapter 11 filing," they would not have spent months

haggling over strike prices they knew would never be reached or anti-dilution protections in anticipation of refinancings they knew would never happen. (A0899, A6629 (summarizing negotiations), A3609 (finalized terms).) Similarly, the Participating Noteholders would not have continued to hold hundreds of millions of the Company's stock and unsecured debt. (A6632.) And Deerfield would not have purchased an additional $17.2 million of 2024 Unsecured Notes that it "knew were soon to be worthless" following the March Exchange. (A0909, A3216-17.) In short, the Committee has not carried its burden in showing that the actual fraudulent transfer claim was colorable.

### 3. The Committee's Claim That Deerfield Aided and Abetted Invitae Officers' and Directors' Alleged Breach of Fiduciary Duties Was Not Colorable.

The Committee also failed to state a colorable aiding and abetting claim against Deerfield. (A0993.) To state a claim for aiding and abetting breach of a fiduciary duty, "one must demonstrate that the party knew that the other's conduct constituted a breach of a fiduciary duty and gave substantial assistance or encouragement to the other in committing that breach." *Bd. of Trustees of Teamsters Loc. 863 Pension Fund* v. *Foodtown, Inc.*, 296 F.3d 164, 174 (3d Cir. 2002). In other words, on top of the underlying breach—which the Committee failed to demonstrate—the Committee also had to allege facts supporting an inference of Deerfield's "knowledge and participation" in the purported breach. *Firefighters'*

38

*Pension Sys. of City of Kansas City, Missouri Tr.* v. *Presidio, Inc.*, 251 A.3d 212, 275 (Del. Ch. 2021). The Committee came woefully short of stating a claim under this "stringent" standard. *Binks* v. *DSL.net, Inc.*, 2010 WL 1713629, at *10 (Del. Ch. Apr. 29, 2010).

***Knowledge.*** The Committee failed to sufficiently allege Deerfield's knowledge. The knowledge requirement, in particular, "makes an aiding and abetting claim among the most difficult to prove." *RBC Cap. Mkts., LLC* v. *Jervis*, 129 A.3d 816, 865-66 (Del. 2015). The claimant must present "proof of scienter," in other words, facts "that the aider and abettor had actual or constructive knowledge that their conduct was legally improper." *Lee* v. *Pincus*, 2014 WL 6066108, at *13 (Del. Ch. Nov. 14, 2014); *Presidio*, 251 A.3d at 275.

The Committee made only conclusory allegations and offered no factual support for scienter. The Proposed Complaint asserts that Deerfield "used its preexisting relationship with the Debtors and its consent rights to encourage the Company's management to enter into [the March Exchange]" and "colluded with the Debtors to hand pick a select group of 2024 Unsecured Noteholders the opportunity to participate in the March Exchange at the expense of other similarly situated creditors." (A0917.) But it provides no details as to why Deerfield might have found the March Exchange "legally improper" or suspected Invitae to be insolvent, let alone that Deerfield *knew* that the directors were breaching their duties

39

in approving the March Exchange. Courts have found bare-bones allegations of this type insufficient to state a claim. *See, e.g.*, *In re Jevic Holding Corp.*, 2011 WL 4345204, at *13 (Bankr. D. Del. Sept. 15, 2011).

***Participation.*** The Committee also failed to state facts sufficient to plausibly allege that Deerfield participated in the breach. The participation prong "requires that the secondary actor have provided substantial assistance to the primary violator." *Buttonwood Tree Value Partners, L.P.* v. *R.L. Polk & Co.*, 2017 WL 3172722, at *9 (Del. Ch. July 24, 2017). The pleading must show that the third party "create[d] or exploit[ed] conflicts of interest" among the Company's directors, "participated in the board's decisions, conspired with [the] board, or otherwise caused the board to make the decisions at issue." *Malpiede* v. *Townson*, 780 A.2d 1075, 1097-98 (Del. 2001).

In this case, the Committee conceded that "the March Exchange was negotiated at arm's length." (A0900.) Furthermore, the facts alleged in the Proposed Complaint only describe "arm's-length negotiations" between Invitae and Deerfield, which "are inconsistent with participation in a fiduciary breach" as a matter of law. *Malpiede*, 780 A.2d at 1098; *see, e.g.*, *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 550 (D. Del. 2005) ("[A]rm's length negotiations are inconsistent with participation in a fiduciary breach."), *aff'd*, 278 F. App'x 125 (3d Cir. 2008).

40

The closest the Proposed Complaint gets to alleging that Deerfield created or exploited a fiduciary breach was its bald assertion that "Deerfield … among other things, direct[ed] and orchestrat[ed] the negotiation, formulation, and effectuation" of the March Exchange. (A0993.)  But the Proposed Complaint lacks factual allegations sufficient to support this assertion.  Indeed, the record *contradicts* such a claim.  Deerfield and Invitae negotiated refinancing for approximately a year before the March Exchange.  (A7272-74.)   During that time, Invitae was simultaneously negotiating with other creditors.  (A2957.)  Invitae had walked away from previous negotiations with Deerfield, and as late as three days before the March Exchange was announced, Invitae was still actively evaluating alternative options that excluded Deerfield entirely.  (*Id.*)  These facts clearly show that the negotiations were at arm's length and that the Committee's aiding-and-abetting claim was not colorable.

C. **The Bankruptcy Court Exercised Its Sound Discretion in Finding That the Committee Failed to Show That the Debtors' Refusal to Pursue the Proposed Claims Was Unjustifiable.**

As the party seeking derivative standing, the Committee bore the burden of "assur[ing] [the Bankruptcy Court] that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce." *G-I Holdings*, 313 B.R. at 629 (quoting *STN*, 779 F.2d at 905-06).  As part of this cost-benefit analysis, the

41

Committee must "allege sufficient facts" that address the "litigation risks" and explain why the hypothetical benefit of pursuing claims was "accurate or reliable." *Diocese of Camden*, 2022 WL 884242, at \*10-11. The Committee must then show that this hypothetical benefit exceeded the actual benefit derived from the Debtor's settlements. *In re Manley Toys Ltd.*, 2020 WL 1580244, at \*8 (Bankr. D.N.J. Mar. 31, 2020). Finally, the Committee must show the alleged benefits of its proposed litigation would redound to the estate as a whole, not to some creditors at the expense of others. *In re Redden*, 2013 WL 5436368, at \*3 (Bankr. D. Del. Sept. 30, 2013).

Here, the Bankruptcy Court exercised its sound discretion in finding that the Committee failed to make these showings.[7]

### 1. The Bankruptcy Court Made Specific Findings with Respect to Its Cost-Benefit Analysis.

Citing a single case—*In re G-I Holdings, Inc.*, 2006 WL 1751793, at \*12 (D.N.J. Aug. 7, 2006)—the Committee asserts that the Bankruptcy Court erred by failing to make specific findings of fact to support a cost-benefit analysis. (OB 16). This is wrong.

---

[7] The Committee cites *In re Gibson Grp.*, 66 F.3d 1436, 1446 (6th Cir. 1995), to argue that if the colorability prong had been met, the burden would then have shifted to the Debtors to demonstrate justifiability. (OB 16.) But courts in the Third Circuit have held that the party seeking derivative standing must, in the first instance, meet its burden with respect to *all* of the elements of derivative standing. *See, e.g.*, *G-I Holdings*, 313 B.R. at 629 ("[I]t is the committee's burden in the first instance to demonstrate that it has satisfied the test for derivative standing."); *Diocese of Camden*, 2022 WL 884242, at \*9, \*12 (denying committee's motion for derivative standing "[a]lthough they appear to [bring] colorable claims" because "the Committee has not shown that Debtor is unjustified in not pursuing the claims"). In addition, as discussed *supra*, the Bankruptcy Court did not find that any of the Proposed Claims were colorable.

42

*G-I Holdings* stands for the uncontroversial proposition that "in the absence of a Third Circuit test[,] the appropriate test to be applied" in determining a derivative standing motion "is the one articulated in" *STN*, 779 F.2d 901. 2006 WL 1751793, at *11. *STN* sets forth a two-part test for derivative standing: "(1) the court must determine whether a claimant has presented a colorable claim; [and] (2) the court must then undertake a cost-benefit analysis." *Id.* With respect to its cost-benefit analysis, *STN* provides that a court may evaluate a non-exhaustive list of factors, including:

1. "The probabilities of legal success in the event the action is pursued";

2. "The cost to the estate in proceeding with the action and the terms relative to any attorneys' fees";

3. "Financial recovery in the event of success";

4. "Whether the action is likely to benefit the reorganization estate"; and

5. "Whether appointment of a trustee or another party to bring the action would be preferable."

*Id.*; *see also STN*, 779 F.2d at 905; OB 14. In *G-I Holdings*, the district court vacated the bankruptcy court's order *granting* the committee derivative standing because the bankruptcy court made no factual findings on the record related to its cost-benefit analysis. 2006 WL 1751793, at *11-12. In "th[is] absence of any findings," the committee sought to defend the bankruptcy court's decision by arguing that factual findings were "*inherent* in the Bankruptcy Court's decision to grant the Committee

43

authority to pursue the [proposed] [c]laims" and that "the Bankruptcy's decision *implicitly* rejected appellees' arguments." *Id.*

The facts of *G-I Holdings* are a far cry from those of this case. Here, the Bankruptcy Court "in undertaking the cost-benefit analysis [took] into account a variety of significant issues and hurdles," before denying derivate standing. (A7977.) Indeed, the Bankruptcy Court examined each of the five *STN* factors listed above (and discussed in *G-I Holdings*).

***First***, the Bankruptcy Court found that the Committee's proposed claims had a low probability of success in light of the "legal and factual obstacles that would have to be surmounted." (*Id.*) For instance, the Bankruptcy Court pointed out that the Committee would have to overcome "the potential availability of safe-harbor defenses under Section 546(e)" (*id.*), which is a complete defense to any claims of constructive fraudulent transfer. *See, e.g.*, *In re Tribune Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 90-91 (2d Cir. 2019); *In re Hechinger Inv. Co. of Delaware*, 274 B.R. 71, 98 (D. Del. 2002). The Bankruptcy Court then emphasized that, with respect to a constructive fraudulent transfer claim, there was a "significant factual dispute as to whether the debtor was insolvent at the time of the relevant transactions as opposed to a hindsight analysis or consideration of subsequent events" and "meaningful factual disputes as to the equivalency of the value received by the debtor from the transactions in question." (A7977.) The

44

Bankruptcy Court also noted that it was "cognizant of a high threshold for overcoming D&O business judgment decisions, the lack of any asserted breach in the underlying financial instruments and documentation and, in general, Deerfield's … lack of status as an insider." (A7979.) These "legal and factual obstacles" support the Bankruptcy Court's ultimate factual conclusion that, in the words of *In re Adelphia Commc'ns Corp.*, 330 B.R. 364, 376 (Bankr. S.D.N.Y. 2005), the Committee would be "embarking on a senseless enterprise." (A7977.)

**Second**, the Bankruptcy Court found that if the Committee were to bring the proposed claims, there would be substantial cost to the estate, which also militated against granting derivative standing. Specifically, the Bankruptcy Court stated that, in denying the Committee's Standing Motion, it considered "the potential risks and administrative costs and delays associated with pursuing substantive litigation" and that it "regard[ed] the scope of the proposed litigation to be substantial requiring considerable resources." (A7978.) Aside from *litigation* costs, the Bankruptcy Court also identified *opportunity* costs and "potential risks … in jettisoning a confirmable plan supported by significant stakeholders," which could "potentially result[] in significant delays and distributions." (A7977.)

**Third**, with respect to "[f]inancial recovery in the event of success," *G-I Holdings*, 2006 WL 1751793, at *11, the Bankruptcy Court explicitly considered "the substantial size of the unsecured creditor body, taking into account the

45

significant investment by Deerfield … *relative to any possible recovery*" in denying the Standing Motion, (A7978 (emphasis added)).   Even if the estate brought the claims and succeeded, the Bankruptcy Court found that any incremental recovery to unsecured creditors would not justify the "considerable resources" required to pursue the proposed claims given the "substantial size of the unsecured creditor body."  (*Id.*)

**Fourth**, the Bankruptcy Court considered "whether the action [wa]s likely to benefit the reorganization estate." *G-I Holdings*, 2006 WL 1751793, at *11. The Bankruptcy Court stated that "whether the debtor has justifiably opted in favor of settlement with Deerfield in lieu of litigation … requires the Court to make an assessment of the benefits to the estate by the settlement embodied in the plan as compared to the risks and hurdles I've already delineated."  (A7980.)

**Finally**, the Bankruptcy Court found that the "appointment of a trustee or another party to bring the action" was not preferable.  *G-I Holdings*, 2006 WL 1751793, at *11.  The Bankruptcy Court noted the Board's "use of professional advisors, Special Committees, and independent directors" to inform its business judgment to not pursue the claims.  (A7978.)  The Bankruptcy Court's detailed discussion regarding the abundance of independent, professions in the investigation of claims further supports its finding that the Committee could do no better in pursuing those claims.

46

In short, the Bankruptcy Court's decision considered all five of the non-exhaustive *STN* factors.

### 2. The Committee Offers No Legitimate Argument That Calls the Debtors' Business Judgment Into Question.

Nothing in the Committee's arguments (below or on appeal) comes close to calling into question the Debtors' determination, in their business judgment, that litigating the Proposed Claims was not justified. *See Cybergenics*, 330 F.3d at 559 (in analyzing justifiability, courts give the management "the usual judicial deference to business judgment"). Specifically, the Committee failed to address the Proposed Claims' opportunity costs, likelihood of success, or costs of litigation. These failures alone merit affirming the decision below. *See, e.g.*, *In re Caesars Ent. Operating Co., Inc.*, 561 B.R. 457, 469 (Bankr. N.D. Ill. 2016) ("Because the Committee has addressed neither potential recovery nor potential cost, the Committee has not shown that the recovery might justify the cost.").

***First***, the Committee has failed to account for the significant benefits the Debtors obtained from the settlement they reached with Deerfield as described above. Indeed, the record shows that the Debtors successfully negotiated the TSA with Deerfield and secured a multitude of benefits for their estates that would not have been achievable through litigation. (Bankr. Dkt. No. 21 at ¶ 77-78.) Among other things, the Debtors obtained: (i) Deerfield's consent to use cash collateral to fund the chapter 11 cases (A0048-102); (ii) agreement on the framework and

milestones for the sale and auction process that resulted in a sale of substantially all of the Debtors' assets; (iii) the ability of Deerfield to credit bid in connection with the auction, which drove up the sale price by approximately $60 million (A0476-599); and (iv) Deerfield's commitment to ensure that administrative claims would be paid in full (an estimated $70+ million) ahead of the recoveries of secured creditors and funding (of up to $15 million) would be available to wind down the Debtors' estates. (A0734-74.)

The Committee's failure to address the benefits the Debtors would forgo by pursuing litigation weighs against granting derivative standing. *See In re Roman Cath. Diocese of Rockville Ctr., New York*, 654 B.R. 212, 223 (Bankr. S.D.N.Y. 2023) (denying standing where the Committee "does not provide the value of any financial recovery nor elaborate on the economic effects of the disastrous consequences of protracted plan confirmation negotiations").

**Second**, the Committee offered no evidence related to the likelihood of success of its proposed claims. The Committee's failure to even attempt to "provide any analysis of those litigation risks or make any showing that the potential benefit outweighs the risks" is fatal to its standing motion, since a cost-benefit analysis requires more than "blind confidence" in the outcome of the proposed claims. *Diocese of Camden*, 2022 WL 884242, at *10-11; *Diocese of Rockville*, 654 B.R. at 223 ("[T]he proposed litigation must not be a 'hopeless filing.'").

48

***Third***, regardless of the likelihood of success of the Committee's proposed claims, the Committee failed to account for litigation costs that are bound to deplete the estate and reduce recovery for hundreds of unsecured creditors. Courts are reluctant to grant a creditor derivative standing to pursue estate claims where the movant cannot show how they plan to finance their proposed litigation. *See, e.g.*, *Manley Toys*, 2020 WL 1580244, at \*8 ; *Diocese of Camden*, 2022 WL 884242, at \*12. Absent a financing plan, "fees of a creditors' committee['s] professionals are generally absorbed by the debtor in possession." *In re Am.'s Hobby Ctr., Inc.*, 223 B.R. 275, 280 (Bankr. S.D.N.Y. 1998).

Here, the Committee fails to identify the source of funding for its 14 Proposed Claims against 20 defendants. And although the Committee boasts the upside potential in its Alternative Plan (OB 21), the Committee never intimates it will "bet" on its own claims through self-financing. *Cf. STN*, 779 F.2d at 906 (holding that derivative standing was appropriate where the creditor's committee agreed to bear fees and seek recompense out of any recovery). Instead, the closest the Committee gets to accounting for the litigation costs is by pointing vaguely to "its ability to pursue the claims on contingency or alternative financing arrangements." (OB 21.) And the only assurance the Committee offers for these hypothetical arrangements is the belief of Mr. Dunn, who, the Committee admits,

49

has not solicited binding proposals to law firms or institutions that finance litigation. (A7629-30.)

Because the Committee has not identified any litigation financing plan, the Court should consider the legal fees the Committee expended to date in estimating the cost of litigating the proposed claims. *Cf. In re Sabine Oil & Gas Corp.*, 562 B.R. 211, 228 (S.D.N.Y. 2016) (holding the bankruptcy court did not abuse its discretion when it "based its calculation of the cost of litigating the claims on a percentage of the estimate provided by the Appellants' own expert"). White & Case—the Committee's counsel who investigated the claims and now brings this appeal—incurred approximately $13.6 million in fees in the chapter 11 cases through the Effective Date of the Plan. (Bankr. Dkt. No. 1048.) These already exorbitant fees—sought from the estate to the detriment of unsecured creditors— flout any indication that the Committee will seek alternative financing, much less its contention that "the costs and risks of pursuing the claims [will be] minimal." (OB 21.)

## III. THE BANKRUPTCY COURT PROPERLY EXERCISED ITS DISCRETION IN APPROVING THE DEBTOR RELEASES.

The Bankruptcy Code provides that a plan may "provide for … the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A). "Courts have consistently recognized that plan settlements under section 1123(b)(3) of the Bankruptcy Code should be evaluated

under the same 'fair, reasonable and in the best interests of the estate' standard applicable to Bankruptcy Rule 9019 settlements." *In re S B Bldg. Assocs. Ltd. P'ship*, 621 B.R. 330, 380-81 (Bankr. D.N.J. 2020). Generally, courts will approve a settlement by the debtors if the settlement "falls within the lowest range of reasonableness." *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 136 (Bankr. D.N.J. 2010). With respect to releases contained in a plan, courts analyze five factors, commonly known as the *Master Mortgage* factors: (i) identity of interest between the debtor and non-debtor; (ii) contribution to the plan by the non-debtor; (iii) the necessity of the release to the plan; (iv) overwhelming acceptance of the plan and release by creditors and interest holders; and (v) payment of all or substantially all of the claims of the creditors and interest holders. *See In re Indianapolis Down*, 486 B.R. 286, 303 (Bankr. D. Del. 2013).

Here, the Bankruptcy Court overruled the Committee's objection to the Debtor Releases, finding that the releases granted under the Plan were reasonable and noting that "each non-Debtor Released Party that will benefit from the Debtors Releases either shares an identity of interest with the Debtors, ***was instrumental to the success of these Chapter 11 Cases, and/or provided a substantial contribution to the Debtors, which value provided a significant benefit to the Debtors' estates***." (A8824 (emphasis added).)

51

Just as the Committee failed to demonstrate that the granting of derivative standing was warranted, it also failed to demonstrate that the Debtors' release of Deerfield under the Plan was inappropriate. While the Committee cherry-picked certain *Master Mortgage* factors in arguing that the releases are unjustified, the Committee ignored that the factors are "neither exclusive nor conjunctive requirements," but rather serve as guidance to courts in determining fairness of a debtor's releases. *In re Washington Mut.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011). The ultimate inquiry is whether the releases are "fair, reasonable and in the best interests of the estate." The record of these cases amply suggests that they are with respect to Deerfield.

Deerfield has made substantial contributions to the Debtors and provided innumerous value to the Debtors in their reorganization efforts. Beginning before the Petition Date, Deerfield spent countless time and resources negotiating the TSA, which not only set out the framework for a successful chapter 11 case, but also provided for the payment in full of 94% of unsecured creditors.[8] Through the TSA, Deerfield also consented to the Debtors' use of cash collateral, allowing operations to continue without incurring substantial debtor-in-possession financing fees. While the Committee argues that the value of consensual use of cash collateral

---

[8]    This recovery was ultimately revised after the Committee objected to the Plan's distribution scheme, which originally provided for the payment in full of the general unsecured claims against the Debtors' subsidiaries.

52

was insignificant because the 2028 Senior Secured Notes are expected to be paid in full, that consent was granted long *before* there was even an actionable sale transaction or any indication that proceeds from the sale would be sufficient to pay the 2028 Senior Secured Notes in full.

The TSA alone provided significant benefit to the Debtors' estate. But throughout the chapter 11 cases, Deerfield assisted the Debtors in a variety of additional ways. Deerfield helped facilitate and supported the Debtors' section 363 sale process, which ultimately funded substantial unsecured creditor recoveries. Deerfield also effectively backstopped the recovery in full for Convenience Class Creditors, the payment in full of administrative expenses and priority claims, and millions of dollars of guaranteed recovery for otherwise out-of-the money general unsecured creditors. Such recoveries were guaranteed under the TSA regardless of the ultimate outcome of the Debtors' section 363 sale process and regardless of the recoveries on account of 2028 Senior Secured Notes.

Courts in this Circuit have found substantial contribution in similar circumstances in approving plan releases. *See In re Tribune Co.*, 464 B.R. 126, 189 (Bankr. D. Del. 2011) (finding non-debtor party had substantially contributed where non-debtor parties entered into a settlement where non-debtor parties agreed to reduce their claim); *In re Long Ridge Road*, 2014 WL 886433, at \*14 (Bankr. D.N.J.

Mar. 5, 2014) (finding that the non-debtor party had substantially contributed by providing financial support, without which the plan would not be feasible).

Simply put, the releases in the Plan were a material inducement to Deerfield to provide substantial contribution to the Debtors' estate, without which there would be no confirmed plan and no reorganization. This Court should therefore affirm the Bankruptcy Court's approval of the releases because they are "fair, reasonable and in the best interests of the estate." *S B Bldg.*, 621 B.R. at 381.

## **CONCLUSION**

For the foregoing reasons, Deerfield respectfully requests that this Court affirm the Bankruptcy Court's orders denying the Standing Motion, confirming the Plan, and approving the Debtor Releases.

Dated: November 15, 2024

/s/ James N. Lawlor
**WOLLMUTH MAHER & DEUTSCH LLP**
James N. Lawlor
500 Fifth Avenue
New York, NY 10110
Telephone:   (212) 382-3300
Facsimile:   (973) 741-2398
Email:          jlawlor@wmd-law.com

**SULLIVAN & CROMWELL LLP**
Justin DeCamp (admitted *pro hac vice*)
Ari Blaut (admitted *pro hac vice*)
Benjamin Beller (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone:   (212) 558-4000
Facsimile:   (212) 558-3588
Email:          decampj@sullcrom.com
                    blauta@sullcrom.com
                    bellerb@sullcrom.com

*Counsel to Deerfield Partners, L.P.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Bankruptcy Procedure 8015(h), the undersigned certifies that the brief submitted herein complies with the type-volume limitation set forth in Federal Rule of Bankruptcy Procedure 8015(7)(B). *See also* Fed. R. Bankr. P. 8015(f) ("A district court or BAP must accept documents that comply with the form requirements of this rule and the length limits set by Part VIII of these rules."). The total word count for all printed text in the body of this Brief, not including items excluded from length under Federal Rule of Bankruptcy Procedure 8015(g), is 12,980 words.

Dated: November 15, 2024                    /s/ *James N. Lawlor*
                                            James N. Lawlor

## CERTIFICATE OF SERVICE

I hereby certify that, on November 15, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of New Jersey by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: November 15, 2024                    /s/ *James N. Lawlor*
                                            James N. Lawlor